UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

ANDREA WILLIS,                          )
                                        )
        *Plaintiff*,                     )
                                        )
v.                                      )       Case No. 1:04-CV-305
                                        )
MIKE NEAL, *et al.*,                     )       Judge Mattice
                                        )
        *Defendants*.                    )

## MEMORANDUM

Plaintiff Andrea Willis brings this civil rights action against the City of Dunlap, Tennessee, Rhea County, Tennessee, Sequatchie County, Tennessee, Clint Huth, Mike Neal, John Argo, Ronnie Hitchcock, and James McMillon.  Ms. Willis states claims for violation of her Fourth Amendment rights under the United States Constitution pursuant to 42 U.S.C. § 1983.  Ms. Willis also brings claims against all defendants under state law for the torts of false arrest, malicious harassment, assault and battery, slander and libel, intentional and negligent infliction of emotional distress, malicious prosecution, abuse of process, and outrageous conduct.  Pending before this Court are four motions for summary judgment filed by the defendants, seeking dismissal of all claims against all defendants: (1) by the City of Dunlap and Clint Huth, the Chief of Police for the City of Dunlap, (2) by Rhea County; Mike Neal, the Sheriff of Rhea County; and John Argo, a member of the Rhea County Sheriff's Department, (3) by Sequatchie County and Ronnie Hitchcock, the Sheriff of Sequatchie County, and (4) by James McMillon.

After reviewing the record in the light most favorable to Ms. Willis, the Court finds that the motion for summary judgment filed by the City of Dunlap and Clint Huth will be **GRANTED**; the motion for summary judgment filed by Rhea County, Mike Neal, and John Argo will be **GRANTED**; the motion for summary judgment filed by Sequatchie County and Ronnie Hitchcock will be **GRANTED IN PART** and **DENIED IN PART**; and the motion for summary judgment filed by James McMillon will be **GRANTED**.

## I.     STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To refute such a showing, the nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute.  *Id.* at 322.  A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment.  *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.     FACTS

The relevant facts, viewed in the light most favorable to plaintiff, are as follows.

In 2003, Andrea Willis was a pilot working at an airport in Fort Walton Beach, Florida, accumulating flying hours in an effort to become a commercial airline pilot. (Court Doc. No. 25-2, Ex. A, Willis Dep. 34.) Through her job at the airport, Ms. Willis was introduced to Jack Marshall, a pilot with whom Ms. Willis began to fly frequently. (*Id.*) On October 6, 2003, Jack Marshall asked Ms. Willis to co-pilot a plane from Destin, Florida, to Tennessee on the following day. (*Id.* at 66.) On the morning of October 7, 2003, Ms. Willis, Jack Marshall, John Marshall (Jack Marshall's son), and Danny Robertson boarded the airplane for the trip to Tennessee. (*Id.* at 68-69.) Ms. Willis understood that the purpose of the trip was related to John Marshall assisting someone in setting up a pawn shop. (*Id.* at 71.) When the airplane arrived at the Dayton, Tennessee, airport, the relevant events occurred.

Prior to October 7, 2003, James McMillon, Jr. had been working as an informant for the 12th Judicial District Drug Task Force (the "Task Force"). (Court Doc. No. 25-2, Ex. C, McMillon Dep. 30.) In that capacity, Mr. McMillon's duty was to bring to the attention of the Task Force any persons who Mr. McMillon thought were breaking the law, and as compensation for his efforts, he was paid 20 percent of all assets seized. (*Id.* at 32.) While working as an informant for the Task Force, Mr. McMillon had a conversation with John Marshall in which the two men set up a money laundering scheme in which Mr. Marshall would provide jewelry in exchange for $287,000 at the Dayton, Tennessee, airport on October 7, 2003. (*Id.* at 50, 62.) During the conversations that took place between Mr. McMillon and Mr. Marshall, Mr. Marshall told Mr. McMillon that he would be bringing his gun for security and that he would be accompanied by his partner, his father, and possibly his father's girlfriend. (*Id.* at 62.)

After receiving the information about this money laundering scheme from Mr. McMillon, Ricky Smith and Roy Sain, the Director and Assistant Director, respectively, of the Task Force, contacted representatives of the City of Dunlap, Sequatchie County, and Rhea County to assist with the "takedown" of the airplane on October 7, 2003. On October 5 or 6, Ricky Smith contacted Clint

Huth to request assistance with security and takedown in conjunction with a money laundering deal. (Court Doc. No. 24-3, Huth Dep. 11.) Mr. Huth was unable to find any other officers who were available to assist, so Mr. Huth agreed to assist by himself. (*Id.*) Also on October 5 or 6, Ricky Smith contacted Ronnie Hitchcock to request backup assistance. (Court Doc. No. 33-3, Hitchcock Dep. 8-9.) Mr. Hitchcock assembled a group of four officers to assist: himself, Jody Lockhart, Cody Smith, and Keith Harrin. (*Id.* at 9-10.) On October 5, Ricky Smith called Mike Neal to request assistance with the takedown part of an operation at the Dayton airport. (Court Doc. No. 27-3, Neal Dep. 16.) Mr. Neal called John Argo (*id.* at 18-19), who assembled a group of several deputies to assist: Mike Bice, Devin Payne, Mike Rose, and Todd Levi. (Court Doc. No. 27-4, Argo Dep. 9.)

On the morning of October 7, 2003, Ricky Smith conducted a briefing for the participants in the takedown. (Huth Dep. 12.) Mr. Smith told the attendees that there was an airplane coming into the Dayton airport and that the takedown involved a money laundering operation on which he had been working, and he divided the attendees into two teams. (*Id.* at 12-13; Hitchcock Dep. 10.) At the meeting, Mr. Huth was assigned to the team that would be stationed in the conference room inside the airport building. (Huth Dep. 13.) Mr. Huth understood that his team was assigned two functions: (1) to provide back-up assistance to the other team, which was assigned to secure any individuals who entered the building and (2) once the individuals were secure, to assist with the securing of the airplane. (Court Doc. No. 24-2, Huth Aff. ¶ 11.) Messrs. Argo, Bice, Payne, and Harrin, and possibly Messrs. Rose and Levi, were assigned to the team in the conference room with Mr. Huth. (Argo Dep. 11; Hitchcock Dep. 11-12.) Mr. Hitchcock, Jody Lockhart, Cody Smith, and several Rhea County officers were assigned to the team that would secure any individuals who entered the building. (Hitchcock Dep. 11-12.) At this meeting, Mr. Smith also told the officers that one or more of the suspects might be armed. (*Id.* at 11.)

On October 7, 2003, when the airplane arrived in Dayton, Ms. Willis, Jack Marshall, and

Danny Robertson exited the plane and walked into the airport building, while John Marshall remained on the plane. (Willis Dep. 80.) When Ms. Willis, Jack Marshall, and Mr. Robertson entered the building, they were directed to the lounge area, and they were followed into the lounge area by two gentlemen. (*Id.* at 81-83.) Unknown to Ms. Willis at the time, the two gentlemen were Sequatchie County deputies Cody Smith and Jody Lockhart. (Hitchcock Dep. 10, 16, 18.) Shortly after entering the lounge area, Ms. Willis attempted to leave the area to go to the restroom but was prohibited from leaving by one of the deputies, who, without identifying himself, told her to sit down. (Willis Dep. 84.) Ms. Willis complied. (*Id.*) Some time (between 15 and 30 minutes) later, Sequatchie County Sheriff Ronnie Hitchcock came into the room and asked Ms. Willis, Jack Marshall, and Mr. Robertson to remove all of their personal belongings, which they did. (*Id.* at 87-88, 89-90.) Then, approximately 15 minutes later, another law enforcement officer with a badge entered the room, pointed a gun at Ms. Willis, Jack Marshall, and Mr. Robertson, and ordered them to get on the ground. (*Id.* at 90-91.) After they complied, Sheriff Hitchcock assured the officer with the gun (a Rhea County deputy, apparently) that they had been patted down, and Ms. Willis, Jack Marshall, and Mr. Robertson were handcuffed and placed back in their chairs. (*Id.* at 91-92; Hitchcock Dep. 18-20.) Approximately 30 minutes after being placed back into their chairs, Ms. Willis, Jack Marshall, and Mr. Robertson were escorted to marked police cars and taken to the Rhea County Jail by a Rhea County deputy. (Willis Dep. 92-94; Argo Dep. 19-20.) While they were being driven away, Mr. Neal arrived at the airport. (Neal Dep. 20.)

During the time that Ms. Willis, Jack Marshall, and Mr. Robertson were still at the airport, Messrs. Huth, Hitchcock, and Argo and the other officers were assisting with the takedown. When Mr. Huth's team exited the conference room, Mr. Huth and another officer looked into the lounge area to make sure that the individuals in the building were secure, at which point Mr. Huth saw Ms. Willis sitting in the lounge area, and the entire team from the conference room then exited the building to assist with the securing of the plane. (Huth Dep. 14-15.)

-5-

When Ms. Willis, Jack Marshall, and Mr. Robertson arrived at the Rhea County Jail, the officers removed the handcuffs and placed ankle shackles on Ms. Willis, Jack Marshall, and Mr. Robertson. (Willis Dep. at 95.) During this process, Ms. Willis requested to use the restroom and did not receive a response. (*Id.* at 96.) Ms. Willis was then placed in a visitation room. (*Id.* at 101.) At some point thereafter, a female police officer came into the visitation room and indicated that the police wanted to interview Ms. Willis. (*Id.*) Ms. Willis requested to use the restroom, and the female police officer responded that she would have to ask the interviewer. (*Id.*) When Ms. Willis was left alone with her interviewer, the interviewer introduced himself to Ms. Willis, although she cannot now recall who he was, and Ms. Willis again requested to use the restroom and was told that she must wait until the conclusion of the interview.[1] (*Id.* at 103.) During the interview, the interviewer made notes on a form document, which he asked Ms. Willis to review, correct, and sign. (*Id.* at 104-05.) She complied, and states that the document was accurate. (*Id.* at 105.) It was during this interview that Ms. Willis was told that she was being arrested for money laundering. (*Id.* at 105-06.) After the interview, she was allowed to use the restroom and was instructed to change into a black and white suit. (*Id.* at 106.) After changing, Ms. Willis requested to use the telephone and was denied, and she was then placed in cell for several hours. (*Id.* at 107.) On January 13, 2004, the charges against Ms. Willis were dismissed. (*Id.* at 126-27.)

## III.    DISCUSSION

Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

---

[1]     It appears that Ms. Willis's interviewer was Roy Sain. (Court Doc. No. 24-4, Willis Dep. 191.)

42 U.S.C. § 1983 (2000). "Section 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law." *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005).

To establish a claim pursuant to § 1983, a plaintiff must demonstrate two elements: "(1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

In this case, plaintiff alleges false arrest, which would be a violation of her rights under the Fourth Amendment. To succeed on a false arrest claim, plaintiff must prove that the police lacked probable cause for the arrest. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

### A.    Officers in their Individual Capacities

Plaintiff Willis alleges that Messrs. Neal, Huth, Hitchcock, and Argo are each liable in their individual capacities under § 1983 for a violation of Ms. Willis's constitutional rights in connection with her false arrest. Defendants Neal, Huth, Hitchcock, and Argo argue that the doctrine of qualified immunity applies and shields them from liability for any alleged constitutional violations in this case.

### 1.    Qualified Immunity

The doctrine of qualified immunity shields " 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The United States Supreme Court has articulated a two-part test for determining whether a law enforcement officer is entitled to qualified immunity. *See Brosseau v.*

*Haugen*, 543 U.S. 194, 125 S. Ct. 596, 598 (2004); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Under this test, district courts must:

> consider whether "the facts alleged show the officer's conduct violated a constitutional right." If the plaintiff can establish that a constitutional violation occurred, a court should ask "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition."

*Lyons v. City of Xenia*, 417 F.3d 565, 571 (6th Cir. 2005) (quoting *Saucier*, 533 U.S. at 201).

Once defendants claim the affirmative defense of qualified immunity, the burden shifts to plaintiff to demonstrate that the defendants are not entitled to the defense of qualified immunity. *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005). When a defendant moves for summary judgment and asserts the defense of qualified immunity, the plaintiffs must "1) identify a clearly established right alleged to have been violated; and 2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995).

The key inquiry in determining whether a right was clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Ewolski*, 287 F.3d at 501 ("For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992))). Although the conduct in question need not have been previously held unlawful, the unlawfulness must be apparent in light of pre-existing law. *Id.* Officials are entitled to qualified immunity " 'when their decision was *reasonable*, even if mistaken.' " *Pray*, 49 F.3d at 1158 (quoting *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)). Further, " 'if officers of reasonable competence could disagree on this issue, immunity should be recognized.' " *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 349 (1986)).

      **2.**     **Analysis**

-8-

The threshold issue is whether plaintiff has alleged a constitutional violation by Neal, Huth Hitchcock, or Argo. *Pray*, 49 F.3d at 1158. Plaintiff appears to be arguing that her detention in the airport and subsequent transport to the Rhea County Jail amounted to an arrest in violation of her Fourth Amendment rights.[2]

Police officers are permitted to briefly detain an individual for investigation if they have "reasonable suspicion that the person has committed a crime." *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003). Such detentions are sometimes referred to as "*Terry* stops," in reference to the decision of the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Heath*, 259 F.3d 522, 528 (6th Cir. 2001). In such limited detentions, police officers do not need probable cause, but must possess a "reasonable and articulable suspicion" that a person has been involved in criminal activity. *Id.*

"A clear deprivation of liberty caused by law enforcement officials without formal words is nonetheless an arrest." *United States v. Canales*, 572 F.2d 1182, 1187 (6th Cir. 1978); *see also Dunaway v. New York*, 442 U.S. 200 (1979); *Gardenhire*, 205 F.3d at 313-14. Thus, even if a police officer possesses the requisite "reasonable suspicion" for a *Terry* stop, the detention "can mature into an arrest if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997); *see also Fisher v. Harden*, 398 F.3d 837, 844 (6th Cir. 2005); *Heath*, 259 F.3d at 529-30.

To prevent a *Terry* stop from escalating into an arrest, the length and manner of the detention should be reasonably related to the reason for the initial stop. *Weaver*, 340 F.3d at 408; *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999). The use of force, such as drawn guns and handcuffs, does not automatically transform the detention into

---

[2]    To the extent Ms. Willis's § 1983 claims against these defendants are based on her formal arrest, which was documented in the Affidavit of Complaint, the Court would dismiss her claims. It is clear from the Affidavit of Complaint [Court Doc. No. 24-5] that the arresting officer was Roy Sain, who is not a defendant in this suit, nor was he employed by a defendant in this suit.

an arrest as long as the show of force is reasonable under the circumstances and "necessary to protect officers from potentially dangerous situations." *Heath*, 259 F.3d at 530; *see also Houston*, 174 F.3d at 814-15. While the length of a *Terry* stop may be longer than momentary, a detention can escalate into an arrest when the length of the stop is extended. *United States v. Place*, 462 U.S. 696, 709-10 (1983) ("[W]e have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case."). Courts, however, have declined to adopt an outside time limitation for a permissible *Terry* stop. *Id.* at 709; *Houston*, 174 F.3d at 815. Courts have held that when an officer's initial inquiries of the detainee do not dispel the reasonable suspicion that formed the basis of the stop, "further detention and questioning are appropriate" because they are reasonably related to the initial basis for the stop. *Id.* Further, "removal of a suspect from the scene of stop generally marks the point at which the Fourth Amendment demands probable cause." *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994); *see also Hayes v. Florida*, 470 U.S. 811, 815 (1985); *Heath*, 259 F.3d at 531.

When a detention escalates into an arrest, the officers must have probable cause for the detention. *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 592 (6th Cir. 1994) ("Any arrest, whether it be formal or de facto, requires probable cause."). The grounds for probable cause need not be known by the arresting officers if those officers were instructed by other officers to conduct the detention and/or arrest; however, the instructing officers must be aware of the grounds for probable cause. *United States v. Hensley*, 469 U.S. 221, 232 (1985); *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971); *Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir. 2003).

In this instance, the initial stop occurred at the direction of Ricky Smith and Roy Sain, based on their conversations with Mr. McMillion, who had set up the meeting with Mr. Marshall. (Huth Dep. 12-13; Hitchcock Dep. 11-12; McMillon Dep. 50, 62.) Plaintiff has not contested the validity of the *Terry* stop in this case; rather, she alleges that the detention she endured escalated into an arrest for which the officers had no probable cause. The facts of Ms. Willis's detention are as

-10-

follows.  While being detained, Ms. Willis was searched, and the officers determined that she was not armed.  (Willis Dep. 87-90.)  Thereafter, officers drew guns and placed Ms. Willis in handcuffs.  (*Id.* at 91-92; Hitchcock Dep. 18-20.)  The officers did not ask Ms. Willis any questions about her identity or her role in the money laundering operation.  Ms. Willis was held in the lounge area for more than one hour and was then transported to the Rhea County Jail.  (Willis Dep. 87-90, 92-94.)  Based on these facts, it is clear that Ms. Willis was "arrested" for Fourth Amendment purposes before her formal arrest at the Jail.

Plaintiff, however, has only sued four officers in their individual capacity, so it must be determined whether each particular officer's conduct amounted to an "arrest," for each officer had a different role in the detention.  Each officer can be held liable if he directed or assisted with an arrest without probable cause.  *Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994).  Officers can only be held liable for acts performed by their subordinates when " 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'"  *Timberlake v. Benton*, 786 F. Supp. 676, 693 (M.D. Tenn. 1992) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).

With regard to Mr. Neal, he arrived at the airport after Ms. Willis had already been transported to the Rhea County Jail.  (Neal Dep. 20.)  Mr. Neal did not take part in any aspect of Ms. Willis's detention and could not, therefore, effect her arrest through his actions.  He also did not direct any of the Rhea County officers to effect a detention or arrest.  Because Mr. Neal's actions did not amount to an arrest, Ms. Willis cannot meet the first prong of her burden of proof on the issue of qualified immunity.  Mr. Neal is entitled to qualified immunity, and the § 1983 cause of action against Mr. Neal in his individual capacity will be **DISMISSED WITH PREJUDICE**.

With regard to Mr. Huth, his duties at the airport included providing back-up to the officers

who were securing the individuals in the airport and securing the airplane. (Huth Aff. ¶ 11.) Ms. Willis argues that, because he was prepared to assist the other team in securing the individuals, Mr. Huth took part in the arrest. However, Mr. Huth did not enter the room in which Ms. Willis was being detained; he did not draw a gun on or handcuff Ms. Willis; he did not hold Ms. Willis in the room; and he did not transport Ms. Willis to the Jail. (Huth Dep. 14-15.) He also did not direct any of the other officers to perform any of these acts. Because Mr. Huth's actions did not amount to an arrest, Ms. Willis cannot meet the first prong of her burden of proof on the issue of qualified immunity. Mr. Huth is entitled to qualified immunity, and the § 1983 cause of action against Mr. Huth in his individual capacity will be **DISMISSED WITH PREJUDICE**.

With regard to Mr. Hitchcock, at the outset he directed his two officers to hold Ms. Willis in the lounge area, (Hitchcock Dep. 10, 16, 18), so the initial *Terry* detention by these officers was at the behest of Mr. Hitchcock. Mr. Hitchcock did not point a gun at or handcuff Ms. Willis, but Mr. Hitchcock did take part in some fashion in the use of force, assuring the handcuffing officers that Ms. Willis had already been frisked to check for guns. (*Id.* at 18-20.) Taking the facts in the light most favorable to Ms. Willis, as this Court must do, the Court concludes that plaintiff has presented evidence sufficient to show that Mr. Hitchcock participated in the *de facto* arrest of Ms. Willis as a result of his direction to his deputies to detain Ms. Willis in the lounge area and his assistance in the handcuffing of Ms. Willis when it was acknowledged that Ms. Willis was not armed and handcuffing was not necessary for the security of the officers present.

With regard to Mr. Argo, his primary function at the airport was the securing of the airplane. (Argo Dep.11.) He did not enter the room in which Ms. Willis was held and did not point his gun at her or handcuff her. He did not transport Ms. Willis to the Jail. However, his deputies performed these actions. (Willis Dep. 91-94; Hitchcock Dep. 18-20; Argo Dep. 19-20.) The question, then, is whether he directed those actions such that he can be held responsible for them. The record does not reveal who ordered the Rhea County deputies to draw their guns on, handcuff, and

transport Ms. Willis. However, the record is clear that Mr. Argo was not on the team with the Rhea County deputies who handcuffed Ms. Willis. (*Id.* at 11; Hitchcock Dep. 11-12.) The record also does not reveal any conversations that took place during the takedown between the two teams. Thus, any determination that Mr. Argo is responsible for directing the arrest of Ms. Willis must be based on the fact that he asked these officers to participate in the takedown. Without more, this Court cannot conclude that Mr. Argo directed his officers to detain, handcuff, or transport Ms. Willis. As a result, Ms. Willis cannot meet the first prong of her burden of proof on the issue of qualified immunity. Mr. Argo is entitled to qualified immunity, and the § 1983 cause of action against Mr. Argo in his individual capacity will be **DISMISSED WITH PREJUDICE**.

Because plaintiff has submitted evidence sufficient to show that Mr. Hitchcock's actions amounted to an arrest, the Court must next determine whether probable cause existed for such arrest. Ms. Willis argues in her brief that the issue of probable cause is not disputed. However, all of the defendants asserted the existence of probable cause in their answers to plaintiff's complaint. It is true that the existence of probable cause was not an issue that was addressed in defendants' briefs, but it is a contested issue.

> Probable cause exists where "the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

*Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)); *see also Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005). "The establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Moncivais*, 401 F.3d 751, 756 (6th Cir. 2005). As stated above, the arresting officers need not have probable cause, so long as the officers who directed the arrest made a determination that probable cause for the arrest existed. *Hensley*, 469 U.S. at 232; *Whiteley*, 401 U.S. at 568; *Feathers*, 310 F.3d at 850. The existence of

-13-

probable cause in a § 1983 action ordinarily presents a jury question, "unless there is only one reasonable determination possible." *Gardenhire*, 205 F.3d at 315.

In this instance, the existence or non-existence of probable cause is a question for the jury. Based on the record, Ricky Smith and Roy Sain were aware of the money laundering scheme as a result of Mr. McMillon's status as an informant. (McMillon Dep. 50, 62.) He told Messrs. Smith and Sain that John Marshall and his partner would be flying into the Dayton airport to engage in a money laundering scheme and that John Marshall indicated he would be carrying a gun. (*Id.*) Mr. McMillon also told them that John Marshall's father and possibly his father's girlfriend would be accompanying him. (*Id.* at 62.) The record states that Mr. Marshall told Mr. McMillon that his dad "is not going to tell on me at all." (*Id.*) In the record that is available to the Court, there is no indication that Mr. Marshall gave further information about the woman who would be traveling with them. Because the parties did not make the absence or presence of probable cause a focal point in their briefs or in the supporting evidence accompanying the briefs, there is not enough evidence in the record available to the Court to determine as a matter of law that probable cause did or did not exist.

Assuming, *arguendo*, that the arrest by Hitchcock of plaintiff was without probable cause, the next inquiry for the Court is whether the constitutional right being asserted by plaintiff was clearly established at the time of the incident, such that a reasonable officer would have understood that his actions violated the right. *Pray*, 49 F.3d at 1158. It is beyond dispute that a reasonable officer would be aware that an arrest requires probable cause, as that principle is contained within the text of the Fourth Amendment. U.S. Const. amend. IV; *Lyons*, 417 F.3d at 573 ("It has long been true that the Fourth Amendment requires probable cause for an arrest."); *Gardenhire*, 205 F.3d at 314-15. It was also clearly established that an arrest based on instructions from other officers is lawful only if the other officers made a determination as to the existence of probable cause. *Hensley*, 469 U.S. at 232; *Whiteley*, 401 U.S. at 568; *Feathers*, 319 F.3d at 850. However,

plaintiff cannot prevail in a § 1983 suit against Hitchcock in his individual capacity because Hitchcock's actions were not objectively unreasonable. Even if the information known by Smith and Sain did not amount to probable cause, Hitchcock was entitled to rely on the instructions of Smith and Sain, and as a result, Hitchcock had a sufficient factual basis for thinking that he was acting in a manner consistent with the Constitution.[3] *Hensley*, 469 U.S. at 232; *Feathers*, 319 F.3d at 851. Therefore, the § 1983 cause of action against Hitchcock in his individual capacity will be **DISMISSED WITH PREJUDICE**.

### B.   Municipalities

Plaintiff Willis alleges that Rhea County, the City of Dunlap, and Sequatchie County are liable under § 1983 for a violation of Ms. Willis's constitutional rights in connection with her false arrest.

### 1.   Municipal Liability

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Municipalities may not be held liable under § 1983 under the theory of *respondeat superior*. *Id.* at 691. Rather, an entity is responsible under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" alleged by plaintiff. *Id.* at 694. In other words, "[t]he plaintiff must . . . demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and

---

[3]      Were this Court to have concluded that the actions of Messrs. Neal, Argo, and Huth amounted to an arrest of plaintiff, this conclusion would be equally applicable to those defendants.

the deprivation of federal rights." *Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

A plaintiff can establish a municipal policy or custom in two ways: (1) a decisionmaker with final authority issues an official proclamation on the subject or (2) a custom is established through a course of conduct that is "so permanent and well settled as to virtually constitute law." *Hilliard v. Walker's Party Store, Inc.*, 903 F. Supp. 1162, 1179 (E.D. Mich. 1995).

"[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). For example, a single decision by legislative body "unquestionably constitutes an act of official government policy" and can subject that municipality to liability under § 1983. *Id.* (citing *Owen v. City of Independence*, 455 U.S. 622 (1980) and *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)). In addition, decisions by officials " 'whose acts or edicts may fairly be said to represent official policy' " may give rise to municipal liability under § 1983. *Id.* at 480 (quoting *Monell*, 436 U.S. at 694). "Official policy" often refers to formal rules that are intended to establish a plan of action that will be followed consistently and over time, but "official policy" can also mean the decision by a governmental entity's authorized decisionmaker to adopt a particular course of action. *Id.* at 480-81. Moreover, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481. However, not every decision by municipal officers subjects a municipality to liability under § 1983. *Id.* "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* When municipal liability is based on a single decision, "the evidence that the municipality . . . acted and that the plaintiff . . . suffered a deprivation of federal rights [must also prove] fault and causation." *Brown*, 520 U.S. at 405.

### 2. Analysis

The threshold issue with regard to the liability of the municipal defendants in this case is whether plaintiff has alleged a constitutional violation. If plaintiff can show a constitutional violation, the second issue is whether the municipality's policy or custom was the "moving force" behind the injury. In this instance, plaintiff alleges that her detention and transport to the Rhea County Jail amounted to an arrest in violation of her Fourth Amendment rights and that the official policies of the respective governmental entities caused that arrest.

With regard to the City of Dunlap, plaintiff argues that Mr. Huth's "official actions in Rhea County" violated her Fourth Amendment rights and constituted official municipal policy because Huth is the policymaker for the City of Dunlap's police force. Plaintiff's argument fails because, as discussed above, Mr. Huth's actions on October 7, 2003, did not amount to an arrest of plaintiff and, therefore, did not violate plaintiff's constitutional rights. *See supra* III.A.2. Because plaintiff has not presented sufficient evidence to create a genuine issue of material fact whether the actions of employees of the City of Dunlap violated her constitutional rights, the Court need not analyze plaintiff's claim further. Plaintiff's § 1983 cause of action against the City of Dunlap will be **DISMISSED WITH PREJUDICE**.

With regard to Rhea County, plaintiff argues that the "official actions" of Messrs. Neal and Argo in Rhea County on October 7, 2003, violated her Fourth Amendment rights and constituted official municipal policy because Neal and Argo are final policymakers for Rhea County. Here, plaintiff's argument likewise fails because, as discussed above, the actions of Messrs. Neal and Argo on October 7, 2003, did not amount to an arrest of plaintiff and, therefore, did not violate plaintiff's constitutional rights. *See supra* III.A.2. Plaintiff, however, does submit facts regarding the conduct of Rhea County officers other than Messrs. Neal and Argo. Specifically, the facts show that Rhea County officers held Ms. Willis in the lounge area, drew their guns on and handcuffed her, and transported her to the Rhea County jail. (Willis Dep. 90-94; Hitchcock Dep. 18-20; Argo Dep. 19-20.) Such actions are sufficient to constitute a *de facto* arrest. As discussed above, the

-17-

question of probable cause is a jury question in this case because the parties have not presented sufficient evidence for the court to determine the existence or non-existence of probable cause as a matter of law.

Having determined that plaintiff met her burden on the first inquiry, the second question is whether the actions by the Rhea County officers on that day were taken pursuant to official policy. The only official policy plaintiff has alleged is the "official actions" of Neal and Argo that day. However, as discussed above, Neal was not present for the takedown and did not provide any direction to the officers regarding their conduct that day. (Neal Dep. 20.) Additionally, plaintiff has not presented any evidence that Mr. Argo ordered the Rhea County officers to drawn their guns on, handcuff, or transport Ms. Willis. It is clear that Mr. Argo was not on the same team as these officers, (Argo Dep. 11; Hitchcock Dep. 11-12), and the record does not reveal any conversations that took place between Mr. Argo and his officers who were on the other team. Plaintiff has presented no evidence that the actions taken by the Rhea County officers that day were at the direction of Messrs. Argo or Neal. Without evidence to create a genuine issue of material fact whether the actions of the Rhea County officers were pursuant to an official policy set by Messrs. Neal or Argo, any claim that plaintiff may have against Rhea County must necessarily rely solely on a theory of *respondeat superior*. Because municipalities cannot be held liable solely on a theory of *respondeat superior*, *Monell*, 436 U.S. at 690, the § 1983 cause of action against Rhea County will be **DISMISSED WITH PREJUDICE**.

With regard to Sequatchie County, plaintiff argues that the "official actions" of Mr. Hitchcock as the final policymaker for Sequatchie County caused a deprivation of her constitutional rights. As discussed above, Hitchcock's actions on October 7, 2003, constituted a *de facto* arrest for which there is a jury question regarding the existence of probable cause. *See supra* III.A.2. Therefore, plaintiff has met the first prong of her burden.

The second question is whether Hitchcock's actions were conducted pursuant to official

policy. Plaintiff argues that Hitchcock's decisions and actions on that day constituted official policy, which is essentially an argument that Sequatchie County is liable for Hitchcock's "single decision" to engage in a *de facto* arrest of plaintiff. *See Pembaur*, 475 U.S. at 481. While it is clear that a governmental entity may be held liable for a single decision by its policymaker, *id.*, courts have declined to hold governmental entities responsible for a single decision unless the evidence that shows the municipal action and the plaintiff's injury also shows fault and causation. *Brown*, 520 U.S. at 405. In this instance, the evidence does not support such a showing.

Hitchcock's actions on October 7, 2003, resulted from the instructions he was given by Ricky Smith and Roy Sain, and it is well-established that police officers are entitled to act on probable cause determinations made by other officers. *Hensley*, 469 U.S. at 232; *Whiteley*, 401 U.S. at 568; *Feathers*, 319 F.3d at 850. Of course, if an arrest is without probable cause, such arrest cannot be insulated from challenge as a result of the arresting officers' reliance on the probable cause determination of other officers. *Whiteley*, 401 U.S. at 568. This does not, however, change the fact that the arresting officers were entitled to act on the other officers' determination.

In this instance, Hitchcock relied on the probable cause determination of Ricky Smith and Roy Sain. This reliance formed part of his "official actions" on October 7, 2003. Because Hitchcock was entitled to rely on the determination made by Roy Sain and Ricky Smith, the municipal policy alleged by plaintiff – Hitchcock's "official actions" – presents a difficult case of fault and causation, one in which the municipal action does not itself violate federal law and does not direct or authorize the deprivation of federal rights. *See Brown*, 520 U.S. at 406. In such an instance, plaintiff must prove that the "facially lawful municipal action . . . was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407. In this instance, plaintiff has not presented sufficient evidence to demonstrate deliberate indifference on the part of Hitchcock. Thus, plaintiff has failed to establish evidence sufficient to create a genuine issue of material fact regarding the second

prong of the municipal liability inquiry with regard to Sequatchie County.  Accordingly, the § 1983

cause of action against Sequatchie County will be **DISMISSED WITH PREJUDICE**.

### C. Officers in their Official Capacities

Plaintiff has sued each of Messrs. Neal, Argo, Hitchcock, and Huth in their official capacities as Sheriff of Rhea County, member of the Rhea County Sheriff's Department, Sheriff of Sequatchie County, and Police Chief of Dunlap, respectively. "A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *see also Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Since the Rhea County Sheriff's Department is not an entity which may be sued, Rhea County is the proper party to address plaintiff's allegations against Mr. Argo. *Matthews*, 35 F.3d at 1049. Each of Rhea County, Sequatchie County, and the City of Dunlap were named defendants to this suit, and each entity's liability has been discussed above. Plaintiff's § 1983 causes of action against Messrs. Neal, Argo, Hitchcock, and Huth in their respective official capacities will be **DISMISSED WITH PREJUDICE**, as they are redundant in light of plaintiff's claims against the governmental entities and the claims against the governmental entities will be dismissed.

### D. Officers in their Capacity as Members of the 12th Judicial District Drug Task Force

Plaintiff has also sued each of Messrs. Neal, Argo, Hitchcock, and Huth in their respective official capacities as members of the 12th Judicial District Drug Task Force (the "Task Force"). "A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews*, 35 F.3d at 1049; *see also Brandon*, 469 U.S. at 471-72. Therefore, plaintiff's claims against Neal, Argo, Hitchcock, and Huth in this capacity are, in essence, claims against the Task Force. The Task Force consists of a number of county and city law enforcement agencies which have voluntarily joined together to cooperate and share resources in their fight against illegal drugs. Pursuant to statute, "a person designated by the district attorney general of each judicial district as a member of a judicial district task force relating to the investigation and prosecution of drug cases" is an employee of the State of Tennessee. Tenn. Code Ann. § 8-42-101(3)(C).

Moreover,

> Notwithstanding any other provisions of law to the contrary, concerning members of judicial district task forces relating to the investigation and prosecution of alleged drug violations, if a claim or suit should be filed against an individual and it is proven that:
> (1)   At the time of the alleged incident, the individual was a member of such task force who was properly certified to the board of claims pursuant to § 8-42-101(3)(C); and
> (2)   The alleged liability arose out of the individual's activities as a task force member;
> then it shall be conclusively deemed that the individual was not an employee, agent, or servant of a local government but was a volunteer to the state.

Tenn. Code Ann. § 8-7-110(c). These statutory provisions lead to the conclusion that the Task Force is a state entity, and its members are state employees. Thus, plaintiff's claims against Messrs. Neal, Argo, Huth, and Hitchcock in their official capacities as members of the Task Force are actually claims against the State of Tennessee.

Neither a state nor its officials acting in their official capacities are "persons" against whom a § 1983 claim may be brought. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002). As a result, plaintiff's claims against Messrs. Neal, Argo, Hitchcock, and Huth in their official capacities as members of the Task Force are not claims properly brought under § 1983 and will be **DISMISSED WITH PREJUDICE**.

**E.      James McMillon**

Plaintiff has sued Mr. McMillon in several capacities: individually, as a member and agent of Rhea County, as an agent and member of the City of Dunlap Police Force, as a member and agent of the Sequatchie County Sheriff's Department, and as a member of the 12th Judicial District Drug Task Force.

Because "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity," *Matthews*, 35 F.3d at 1049; *see also Brandon*, 469 U.S. at 471-72,

plaintiff's claims against Mr. McMillon as a member and agent of Rhea County, the City of Dunlap Police Force, the Sequatchie County Sheriff's Department, and the Task Force are actually claims against Rhea County, the City of Dunlap Police Force, the Sequatchie County Sheriff's Department, and the State of Tennessee. *See supra* III.C, III.D. Because the City of Dunlap Police Force and the Sequatchie County Sheriff's Department are not entities which may be sued, the City of Dunlap and Sequatchie County are the proper parties to address plaintiff's allegations against Mr. McMillon in those two capacities. *Matthews*, 35 F.3d at 1049.

Assuming, *arguendo*, that Mr. McMillon is an agent of Rhea County, the City of Dunlap, Sequatchie County, and the State of Tennessee, *see Matje v. Leis*, 571 F. Supp. 918, 927 (S.D. Ohio 1983) (citing *United States v. Brown*, 635 F.2d 1207 (6th Cir. 1980), and *United States v. Bowling*, 666 F.2d 1052 (6th Cir. 1981)), plaintiff's claims against these entities must be dismissed. The Court has addressed above plaintiff's claims under § 1983 against Rhea County, the City of Dunlap, Sequatchie County, and the State of Tennessee and concluded that such claims will be dismissed with prejudice. *See supra* Part III.B.2, III.D. Plaintiff's § 1983 causes of action against Mr. McMillon in his various official capacities will be **DISMISSED WITH PREJUDICE** because they are redundant in light of plaintiff's claims against the entities and because the claims against the entities will be dismissed with prejudice.

Plaintiff has also sued Mr. McMillon in his individual capacity under § 1983. As outlined above, "[s]ection 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law." *Romanski*, 428 F.3d at 636. A private actor, such as Mr. McMillon, "acts under color of state law when [his] conduct is 'fairly attributable to the state.' " *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 947 (1982)). Assuming, *arguendo*, that Mr. McMillon was acting under color of state law by assisting the officers as an informant, *see Matje*, 571 F. Supp. at 927 (citing *United States v. Brown*, 635 F.2d 1207 (6th Cir. 1980), and *United States v. Bowling*, 666 F.2d 1052 (6th Cir. 1981)), Mr. McMillon cannot be held

-23-

liable for plaintiff's alleged false arrest because he took no part in the actions that caused the arrest. "A defendant may not be held liable in a civil rights action absent a clear showing that he or she was personally involved in the activities which form the basis of the alleged unconstitutional behavior." *Williams v. Ohio Dep't of Dev.*, No. 5:05CV1943, 2005 WL 2416937, at *2 (N.D. Ohio Sept. 30, 2005). Mr. McMillon did not enter the lounge area where Ms. Willis was detained, did not draw a gun on or handcuff Ms. Willis, and did not transport Ms. Willis to the Rhea County Jail. Mr. McMillon did not direct anyone to perform these actions. Although Mr. McMillon was involved in the investigation leading up to plaintiff's *de facto* and formal arrests, he did not participate in those arrests and cannot be held liable for them. Therefore, plaintiff's claims under § 1983 against Mr. McMillon in his individual capacity will be **DISMISSED WITH PREJUDICE**.

### F. State Law Claims

Plaintiff asserts against all defendants state law claims of false arrest, malicious harassment, assault and battery, slander and libel, intentional and negligent infliction of emotional distress, malicious prosecution, abuse of process, and outrageous conduct.

Defendants argue that the Court should decline to exercise supplemental jurisdiction over these state law claims because the federal causes of action under § 1983 will be dismissed. However, "the district court has a duty under Rule 8(a) of the Federal Rules of Civil Procedure to read the complaint liberally and determine whether the facts set forth justify it in assuming jurisdiction on grounds other than those pleaded." *Hildebrand v. Honeywell, Inc.*, 622 F.2d 179, 181 (6th Cir. 1980); *see also Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir. 1978) (citing *New York State Waterways Ass'n, Inc. v. Diamond*, 469 F.2d 419 (2d Cir. 1972)); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1206 (3d ed. 2004).

In this instance, with regard to plaintiff's state law claims against Rhea County, the City of Dunlap, Sequatchie County, and Messrs. Neal, Argo, Huth, Hitchcock, and McMillon in their individual capacities and in their official capacities as employees or agents of the municipal

defendants, the complaint alleges complete diversity of citizenship and the minimum jurisdictional amount in controversy. (Am. Compl. ¶¶ 1-8; *id.* at 8, ¶ 3.) Consequently, diversity jurisdiction is evident from the face of the complaint with regard to the state causes of action against the above-listed defendants in those capacities, and this Court may hear and otherwise address those state law claims in accordance with its original jurisdiction. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 605 F.2d 1340, 1343 (5th Cir. 1979).

With regard to plaintiff's state law claims against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon in their official capacities as members of the Task Force, the Court does not have original jurisdiction over these claims. As explained above, these claims are actually claims against the State of Tennessee. *See supra* III.D. It has long been the rule that a state is not a "citizen" for purposes of diversity jurisdiction under 28 U.S.C. § 1332. *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973); *Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894); *Baker v. Minn. Mining & Mfg. Co.*, 99 Fed. App'x 718, 721 (6th Cir. 2004). As a result, diversity jurisdiction cannot exist between plaintiff Willis and the State of Tennessee. Since the Court does not have original jurisdiction over these claims, the Court must determine whether it may address these claims based on supplemental jurisdiction under 28 U.S.C. § 1367.

In cases in which a federal district court has original jurisdiction over one or more claims, 28 U.S.C. § 1367 gives the district court supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." At first blush, this grant of jurisdiction might seem to apply to the claims against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon in their official capacities as members of the Task Force. However, as noted above, the claims at issue are actually claims against the State of Tennessee. Under the Eleventh Amendment[4], a state may be subject to the suit of an

---

[4] The Eleventh Amendment provides that the "judicial power of the United States shall not be construed to extend to any suit in law or in equity, commenced or prosecuted against one

-25-

individual only if (1) it consents to the suit in unequivocal terms or (2) Congress unequivocally expresses its intent to abrogate the immunity. *Green v. Mansour*, 474 U.S. 64, 68 (1985); *Nelson v. Miller*, 170 F.3d 641, 645-46 (6th Cir. 1999). The grant of jurisdiction in 28 U.S.C. § 1367 does not extend to claims against state defendants that have not consented to be sued. *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 541-42 (2002). The State of Tennessee has not consented to be sued with regard to these claims. As a result, this Court lacks jurisdiction to hear plaintiff's claims against the State of Tennessee. Accordingly, plaintiff's claims against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon in their official capacities as members of the Task Force will be **DISMISSED WITHOUT PREJUDICE** as to plaintiff's refiling in state court.

The Court will now address plaintiff's state law causes of action over which the Court has original jurisdiction.

Some of plaintiff's claims are governed by the Tennessee Governmental Tort Liability Act ("TGTLA"). Tennessee Code Annotated § 29-20-307 provides that Tennessee "circuit courts shall have exclusive original jurisdiction over any action brought under the [TGTLA]." Although courts have appropriately dismissed claims arising under the TGTLA because of this provision, those dismissals occurred in cases in which courts had supplemental jurisdiction over the state law claims at issue and chose to decline to exercise such jurisdiction, as was their right to do in certain circumstances. *E.g.*, *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000); *Timberlake v. Benton*, 786 F. Supp. 676, 696 (M.D. Tenn. 1992). In this instance, the state law claims are appropriately before the Court based on diversity jurisdiction rather than supplemental jurisdiction. As a result, the Court will not dismiss these claims based on Tenn. Code Ann. § 29-20-307. *Cf. Hunter v. City of Chattanooga*, 50 F. App'x 239, 240-41 (6th Cir. 2002) (affirming the district court's ruling under the TGTLA regarding immunity from state law claims).

---

of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI.

-26-

At the outset, the Court, as stated above, recognizes that a "suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews*, 35 F.3d at 1049; *see also Brandon*, 469 U.S. at 471-72. Therefore, plaintiff's state law claims against Neal, Argo, Huth, and Hitchcock in their respective official capacities are **DISMISSED WITH PREJUDICE** because they are redundant in light of plaintiff's claims against the entities.

Under the TGTLA, "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a). "Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment *except if the injury arises out of*: . . . false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights [or] the institution of prosecution of any judicial or administrative proceeding, even if malicious or without probable cause . . . ." Tenn. Code Ann. § 29-20-205 (emphasis added). The exceptions listed in § 29-20-205 are the only torts for which immunity is *not* removed when an injury is proximately caused by a negligent act or omission of an employee within the scope of his employment. *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001). As a result, in this case, Rhea County, the City of Dunlap, and Sequatchie County are immune from suit for the causes of action listed in Tenn. Code Ann. § 29-20-205. Accordingly, plaintiff's claims against Rhea County, the City of Dunlap, and Sequatchie County for false arrest, slander and libel, intentional infliction of emotional distress[5], malicious prosecution, and abuse of process will be **DISMISSED**

---

[5]     The phrase "infliction of mental anguish" includes only the tort of intentional infliction of emotional distress, and not the tort of negligent infliction of emotional distress. *Sallee v. Barrett*, 171 S.W.3d 822, 829 (Tenn. 2005).

**WITH PREJUDICE**.

In addition, § 29-20-205 of the TGTLA provides that immunity is retained when the injury arises out of "civil rights." This Court construes "civil rights" under § 29-20-205 as including claims arising under the federal civil rights laws and the United States Constitution. *Hale v. Randolph*, No. 1:02-cv-334, 2004 WL 1854179, at *17 (E.D. Tenn. Jan. 30, 2004); *cf. Brooks v. Sevier County*, 279 F. Supp. 2d 954, 960 (E.D. Tenn. 2003). Here, as in *Hale*, plaintiff's state law claims against the governmental entities "clearly arise out of and directly flow from the allegations that the police officers deprived [plaintiff] of [her] civil rights by falsely arresting [plaintiff] without probable cause." *Hale*, 2004 WL 1854179, at *17. Because plaintiff asserts her state law claims in the context of a civil rights case, her alleged injuries arise out of "civil rights" and the governmental entities are entitled to immunity under the TGTLA. *See id.* This determination forms the basis for an alternative reason for the dismissal of plaintiff's claims of false arrest, slander and libel, intentional infliction of emotional distress, malicious prosecution, and abuse of process against Rhea County, the City of Dunlap, and Sequatchie County. Further, plaintiff's state law claims of malicious harassment, assault and battery, and negligent infliction of emotional distress against Rhea County, the City of Dunlap, and Sequatchie County will be **DISMISSED WITH PREJUDICE**, as plaintiff's alleged injuries related to these causes of action also arise out of civil rights.

Under the TGTLA, if the governmental entity at issue is amenable to suit – in other words, if immunity has been removed by § 29-20-205 – then the entity is the proper party-defendant, and the entity's employees are immune from suit. Tenn. Code Ann. § 29-20-310(b); *Sallee v. Barrett*, 171 S.W.3d 822, 826 (Tenn. 2005). Conversely, if the governmental entity is not amenable to suit

---

Further, outrageous conduct and intentional infliction of emotional distress are not two separate torts, but are different names for the same cause of action. *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997). As a result, plaintiff's listing of both outrageous conduct and intentional infliction of emotional distress in her complaint is redundant. The Court will discuss this claim under the name "intentional infliction of emotional distress."

– in other words, if immunity has not been removed by § 29-20-205 – then employees of the entity are proper party-defendants. Tenn. Code Ann. § 29-20-310(c). Accordingly, since Rhea County, the City of Dunlap, and Sequatchie County are immune from suit regarding plaintiff's state law claims, those claims are properly brought against Messrs. Neal, Argo, Huth, and Hitchcock in their respective individual capacities.

The TGTLA only addresses the liability of governmental entities and employees of those entities. Mr. McMillon is not an employee of any of the governmental entities that are defendants to this action. Tenn. Code Ann. §§ 29-20-102, 29-20-107. As a result, all of plaintiff's state law claims (except outrageous conduct, *see supra* note 4) against Mr. McMillon in his individual capacity remain.

The Court will address now each of the state law causes of action against the remaining defendants – Messrs. Neal, Argo, Huth, Hitchcock, and McMillon.

### 1. False Arrest

The elements of false arrest, which is known as false imprisonment in Tennessee, are "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990); *see Barbee v. Wal-Mart Stores, Inc.*, No. W2003-00017-COA-R3-CV, 2004 WL 239763, at *5 (Tenn. Ct. App. Feb. 9, 2004).

With regard to the first element, Messrs. Neal, Argo, Huth, and McMillon did not detain or restrain Ms. Willis and, therefore, cannot be held liable for false arrest. As discussed above, there is no factual dispute regarding these gentlemen's respective positions on the day of the takedown: none of these gentlemen entered the lounge area where Ms. Willis was held. Because none of these gentlemen took part in detaining or restraining Ms. Willis, Ms. Willis cannot meet her burden of proving the first element of false arrest, and plaintiff's claims of false arrest against Messrs. Neal, Argo, Huth, and McMillon will be **DISMISSED WITH PREJUDICE**.

-29-

With regard to Mr. Hitchcock, as discussed above, plaintiff has presented sufficient evidence of Hitchcock's participation in Ms. Willis's *de facto* arrest, and the question of whether the arrest was unlawful (*i.e.*, whether probable cause existed) is a question for the jury. *See supra* III.A.2. Accordingly, Defendant Hitchcock's motion for summary judgment with regard to the state law false arrest claim is **DENIED**.

### 2. Malicious Harassment

The elements of a claim of malicious harassment are (1) that the person acted maliciously, meaning the person acted with "ill-will, hatred or spite," and (2) that the person "unlawfully intimidated another from the free exercise or enjoyment of a constitutional right by injuring or threatening to injure or coercing another person or by damaging, destroying or defacing any real or personal property of another." *Washington v. Robertson County*, 29 S.W.3d 466, 473 (Tenn. 2000).

With regard to the first element, plaintiff has not alleged, nor has she submitted facts to support the conclusion, that Messrs. Neal, Argo, Huth, Hitchcock, or McMillon acted maliciously. Prior to October 7, 2003, the defendants were not aware of who Ms. Willis was or whether she would be on the plane. (Huth Dep. 12-13; McMillon Dep. 62.) Plaintiff's allegation that defendants' arrest of her was without probable cause, without more, does not substantiate a claim of maliciousness. Accordingly, plaintiff's claims of malicious harassment against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon will be **DISMISSED WITH PREJUDICE**.

### 3. Assault and Battery

An assault is "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Lewis v. Metropolitan Gen. Sessions Court for Nashville and Davidson County*, 949 S.W.2d 696, 703 (Tenn. Crim. App. 1997); *Dowlen v. Mathews*, No. M2001-03160-COA-R3-CV, 2003 WL 1129558, at *2 (Tenn. Ct. App. Mar. 14, 2003). This definition of

-30-

assault "requires an intentional act creating a reasonable apprehension of imminent physical harm on the part of the plaintiff." *Id.*

With regard to Messrs. Neal, Argo, Huth, and McMillon, plaintiff has not submitted any facts showing any intentional act on the part of any of these gentlemen that would have put Ms. Willis in reasonable apprehension of physical harm. None of these gentlemen entered the lounge area where Ms. Willis was detained or interacted with Ms. Willis in any way. Therefore, plaintiff's claims of assault against Messrs. Neal, Argo, Huth, and McMillon will be **DISMISSED WITH PREJUDICE**.

With regard to Mr. Hitchcock, plaintiff also has not submitted any facts showing any intentional act on the part of Mr. Hitchcock that would have put Ms. Willis in reasonable apprehension of physical harm. Ms. Willis states that her interaction with Mr. Hitchcock consisted of Mr. Hitchcock entering the room on two occasions. On the first occasion, he asked Ms. Willis to remove her personal belongings. (Willis Dep. 87-88, 89-90.) On the second occasion, Mr. Hitchcock assured another officer that Ms. Willis had been patted down. (*Id.* at 91-92.) Such actions by Mr. Hitchcock do not constitute an attempt or the appearance of an attempt to do physical harm to Ms. Willis. Because Ms. Willis has not presented sufficient evidence to create a genuine issue of material fact whether Mr. Hitchcock attempted or otherwise gave the appearance of an attempt to physically harm Ms. Willis, plaintiff's claim of assault against Hitchcock will be **DISMISSED WITH PREJUDICE**.

A battery is the intentional, unlawful touching of a person or something intimately associated with that person. *Lewis*, 949 S.W.2d at 703. Plaintiff has not submitted any facts showing that any of Messrs. Neal, Argo, Huth, Hitchcock, or McMillon touched plaintiff or something intimately associated with plaintiff. None of Messrs. Neal, Argo, Huth, or McMillon entered the lounge area where Ms. Willis was detained, and none of these gentlemen handcuffed or restrained Ms. Willis or took Ms. Willis to the Rhea County Jail. With regard to Mr. Hitchcock, plaintiff alleges only that Mr. Hitchcock asked her to remove her personal belongings and assured another officer that Ms.

-31-

Willis had been patted down. (Willis Dep. 87-92.) Plaintiff does not allege that Hitchcock touched her or anything intimately associated with her. Accordingly, plaintiff's claims of battery against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon will be **DISMISSED WITH PREJUDICE**.

### 4. Slander and Libel

Slander and libel are forms of defamation. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). To establish a *prima facie* case of defamation, plaintiff must prove that "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; and 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). "Publication" means the communication of the defamatory matter to a third party. *Id.*

In this case, since plaintiff does not identify any other statements in her deposition or the other submitted materials, plaintiff's claims apparently arise from the article that was published by *The Herald-News* and a report on a television broadcast in East Tennessee. (Willis Dep. 218-19.) Plaintiff, however, has not presented evidence sufficient to create a genuine issue of material fact regarding whether any of the defendants published any statements about Ms. Willis that formed a part of or led to the article or report. The article itself does not quote any of the defendants by name, (Court Doc. No. 24-6, Article 1-2), and plaintiff does not allege and has not presented any evidence to show that any of the defendants contributed to the article or otherwise published a statement about Ms. Willis and the events of October 7, 2003. Therefore, plaintiff's claims of slander and libel against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon will be **DISMISSED WITH PREJUDICE**.

### 5. Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress are as follows: (1) defendant's conduct must be intentional or reckless; (2) defendant's conduct must be "so outrageous that it is

not tolerated by civilized society"; and (3) defendant's conduct must result in serious injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Tennessee courts have adopted the high threshold standard of the Restatement (Second) of Torts for determining whether the conduct at issue is so outrageous as to be tortious:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

*Id.* at 623 (citations and internal quotations omitted). A court's duty is to determine whether the defendant's conduct is so extreme and outrageous that recovery must be permitted. *Id.*

Plaintiff alleges that the outrageous conduct in this case is the defendants' refusal to allow Ms. Willis to go to the restroom while she was being detained. Assuming, *arguendo*, that the refusal of permission to go to the restroom is conduct that reaches the high threshold standard adopted by the Tennessee courts, Ms. Willis has not presented any evidence that she was refused permission to go to the restroom by any of Messrs. Neal, Argo, Huth, Hitchcock, or McMillon. Of these defendants, Ms. Willis only interacted with Mr. Hitchcock, and plaintiff makes clear in her deposition that she did not ask Mr. Hitchcock for permission to use the restroom. (Willis Dep. 88, 91-93.)

Further, to the extent that plaintiff bases her claims of intentional infliction of emotional distress on other actions by these defendants, Ms. Willis has failed to present sufficient evidence to create a genuine issue of material fact as to whether the conduct of Messrs. Neal, Argo, Huth, Hitchcock, and McMillon was so outrageous that it is not tolerated by civilized society. The undisputed record shows that Neal, Argo, Huth, and Hitchcock were assisting with the takedown of an operation being investigated by the Task Force. (Huth Dep. 11; Hitchcock Dep. 8-9; Neal

Dep. 16, 18-19.) McMillon, as an informant, had contributed to the investigation prior to the takedown. (McMillon Dep. 30, 50, 62.) Such contributions by police officers and informants are expected and necessary to effective law enforcement. Of course, if civil rights or other violations occur in the process of these contributions, there are remedies for those violations. But in the context of intentional infliction of emotional distress, the threshold is different. Society considers it valuable for informants to contribute to investigations and for officers to assist other officers in takedowns and in making arrests in connection with investigations. As a result, informants and officers who offer their assistance will not be deemed to have engaged in outrageous conduct unless the informants and officers take specific actions in a certain instance that exceed the normal conduct associated with investigations and takedowns. In this case, Ms. Willis has not presented any evidence to show that the actions of Messrs. Neal, Argo, Huth, Hitchcock, and McMillon exceeded normal conduct and rose to the level necessary to deem the actions outrageous.

Therefore, plaintiff's claims of intentional infliction of emotional distress against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon will be **DISMISSED WITH PREJUDICE**.

### 6. Negligent Infliction of Emotional Distress

The elements of negligent infliction of emotional distress are (1) duty, (2) breach of duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation. *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004). In addition, "plaintiff must establish the existence of a serious or severe emotional injury that is supported by expert medical or scientific evidence." *Id.*; *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996). An emotional injury is "serious" or "severe" "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id.*

Plaintiff has not pointed out any particular actions of the defendants that constitute negligent infliction of emotional distress, so the Court will consider each defendant's collective actions on October 7, 2003. With regard to Messrs. Neal, Argo, Huth, and McMillon, none of these gentlemen

-34-

detained, arrested, or even interacted with Ms. Willis. As a result, regardless of their conduct that day, Ms. Willis's claim fails on the causation elements because she has not presented sufficient evidence to create a genuine issue of material fact whether the actions of Messrs. Neal, Argo, Huth, and McMillon caused her alleged injuries.

Further, with regard to Messrs. Neal, Argo, Huth, Hitchcock, and McMillon, plaintiff has not presented evidence sufficient to create a genuine issue of material fact regarding whether she suffered a "serious" or "severe" emotional injury. Although plaintiff describes TMJ, headaches, and yeast infections that have resulted from the events on October 7, 2003, (Willis Dep. 148, 151-52, 154-56), plaintiff fails to submit "expert medical or scientific proof" of such injuries, which is required under Tennessee law. *Lourcey*, 146 S.W.3d at 52; *Camper*, 915 S.W.2d at 446. As a result, plaintiff's claims against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon for negligent infliction of emotional distress will be **DISMISSED WITH PREJUDICE**.

### 7. Malicious Prosecution

Malicious prosecution is "the employment of legal process for its ostensible purpose, but without probable cause." *Donaldson v. Donaldson*, 557 S.W.2d 60, 62 (Tenn. 1977). To establish a *prima facie* case of malicious prosecution, the plaintiff must prove that the defendant maliciously initiated legal proceedings against the plaintiff without probable cause and that those proceedings were terminated in plaintiff's favor. *Bell v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999).

In this instance, the Affidavit of Complaint against Ms. Willis was signed by Roy Sain. (Court Doc. No. 24-5, Aff. of Compl. 1.) None of Messrs. Neal, Argo, Huth, Hitchcock, or McMillon initiated legal proceedings against Ms. Willis. Consequently, plaintiff's claims of malicious prosecution against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon will be **DISMISSED WITH PREJUDICE**.

### 8. Abuse of Process

"An action for abuse of process lies for the use of legal process to obtain a result it was not intended to effect, for a wrongful purpose." *Donaldson*, 557 S.W.2d at 62. To establish a claim for abuse of process, plaintiff must prove "(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge." *Bell*, 986 S.W.2d at 555. A cause of action for abuse of process hinges on the improper use of process after it has been issued rather than on malicious issuance of process. *Id.*

In this instance, plaintiff has not alleged or presented evidence sufficient to create a genuine issue of material fact as to either element of the claim. First, plaintiff has not produced any evidence that Neal, Argo, Huth, Hitchcock, or McMillon possessed an ulterior motive. Second, plaintiff has not produced any evidence that Neal, Argo, Huth, Hitchcock, or McMillon were involved in the prosecution of Ms. Willis such that they even had the opportunity to perform "an act in the use of process," let alone that they actually performed such an act. None of these gentlemen instituted process against Ms. Willis, and none of these gentlemen pursued or were involved in the prosecution that resulted from the process that was instituted against her by Roy Sain. (Aff. of Compl.) Accordingly, plaintiff's claims against Messrs. Neal, Argo, Huth, Hitchcock, and McMillon for abuse of process are **DISMISSED WITH PREJUDICE**.

## IV.    CONCLUSION

After reviewing the factual record in the light most favorable to the plaintiff and the applicable law, the Court concludes that no genuine issue of material fact exists regarding plaintiff's claims against the City of Dunlap, Clint Huth, Rhea County, Mike Neal, John Argo, Sequatchie County, Ronnie Hitchcock, and James McMillon brought pursuant to 42 U.S.C. § 1983, and these claims will be **DISMISSED WITH PREJUDICE**. Plaintiff's state law claims against Neal, Argo, Huth, and McMillon will be **DISMISSED WITH PREJUDICE**, with the exception of the claims against Neal, Argo, Huth, and McMillon in their official capacities as members of the Task Force, which will be **DISMISSED WITHOUT PREJUDICE**. Plaintiff's state law claims of malicious harassment, assault

and battery, slander and libel, intentional and negligent infliction of emotional distress, malicious prosecution, and abuse of process against Hitchcock will be **DISMISSED WITH PREJUDICE**, with the exception of the claims against Hitchcock in his official capacity as a member of the Task Force, which will be **DISMISSED WITHOUT PREJUDICE**.  Plaintiff's state law claim of false arrest against Hitchcock in his official capacity as Sheriff of Sequatchie County will be **DISMISSED WITH PREJUDICE**.  Plaintiff's state law claim of false arrest against Hitchcock in his official capacity as a member of the Task Force will be **DISMISSED WITHOUT PREJUDICE**.  Plaintiff's state law claim of false arrest against Hitchcock in his individual capacity remains.

The motion for summary judgment filed by the City of Dunlap and Clint Huth will be **GRANTED**.  The motion for summary judgment filed by Mike Neal, John Argo, and Rhea County will be **GRANTED**.  The motion for summary judgment filed by Ronnie Hitchcock and Sequatchie County will **GRANTED IN PART** and **DENIED IN PART**.  The motion for summary judgment filed by James McMillon will be **GRANTED**.

A separate order will enter.


       _s/ Harry S. Mattice, Jr._
       HARRY S. MATTICE, JR.
       UNITED STATES DISTRICT JUDGE